UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

SHELLY L. FLOOD, *et. al.*,          )
                                     )
          Plaintiffs,          )
                                     )
      v.          )          1:12-cv-00105-GZS
                                     )
BANK OF AMERICA CORPORATION,          )
*et al.*,          )
                                     )
          Defendants          )

## RECOMMENDED DECISION

Shelly Flood and Keri Flood brought this civil action against Bank of America

Corporation and FIA Card Services NA, pursuant to the Maine Human Rights Act and Maine

common law.  Shelly Flood alleges sexual-orientation discrimination in employment and

defamation.  Keri Flood alleges tortious interference and defamation.  The action is in this court

based on diversity jurisdiction.  Currently pending is Defendants' Motion for Summary

Judgment (ECF No. 60), which the court referred for report and recommendation.  For reasons

that follow, I recommend that the court grant the motion as to Shelly Flood's discrimination and

defamation claims.  I recommend denying the motion as to Keri Flood's claims.

### FACTS[1]

Plaintiff Shelly L. Flood a/k/a/ Shelly O'Donnell-Flood[2] was employed by FIA Card

Services, N.A./Bank of America[3] from July 24, 2006, to October 1, 2010.  During her tenure

with the Bank, Shelly held a number of positions generally falling under the "customer

---

[1]      For purposes of the defendants' motion, the facts of the case have been presented by the parties in three statements of material facts, pursuant to Local Rule 56:  (1) Defendants' Statement of Material Facts;  (2) Plaintiffs' Opposing Statement and Additional Statement (ECF No. 63);  and (3) Defendants' Reply Statement (ECF No. 67). In addition to these statements, the parties have filed a Stipulated Record (ECF No. 59), which attaches twenty-one exhibits.

service" umbrella.  She held the positions at the Bank's 24-hour call center in Belfast, Maine.

From March 2009, Shelly held the position of Senior Credit Analyst II ("SCA-II") in the

Existing Customer Credit and Retention Department ("ECCR").  In this position she was mostly

on the phone speaking with bank customers.  She could have between 45 and 90 calls per day in

this position, whereas her prior position, Customer Assistance Senior Account Manager, had a

reduced call volume that she described as involving between 10 and 15 calls per day.  As a SCA-

II, Shelly Flood was subject to having managers monitor her calls on a random and unannounced

basis.  The managers would provide feedback if they had concerns. [4]  (Statement ¶¶ 1-6;

Opposing Statement ¶¶ 1-6.[5])

Shelly's team leader was Jeremy Treneer, a "lead associate."  There were multiple teams.

One step up on the supervisory ladder from Treneer and the other team leaders was Diana Castle,

the unit manager.  Castle supervised both the team leaders and associates, with responsibility for

roughly 200 associates.  Castle reported, in turn, to Brian King, the ECCR regional manager.

(Statement ¶ 8.)  Castle was the senior official at the Bank's Belfast branch.  (Additional

---

[2]     The defendants refer to Shelly Flood as "O'Donnell-Flood" to distinguish her from Keri Flood, whom they refer to as "Flood."  I have instead used Shelly Flood and Keri Flood and, on occasion, Shelly or Keri, to distinguish the plaintiffs.

[3]     Bank of America says that it has been improperly named as a defendant and that FIA Card Services is the proper defendant.  However, it has not cited anything of evidentiary quality to refute its employer status.  The plaintiffs cite a position paper that Bank of America filed with the Maine Human Rights Commission as evidence that Bank of America was Shelly Flood's employer.  The record is not adequate for the court to dismiss Bank of America on the ground that it was not Shelly Flood's employer and there is no actual legal briefing of the issue.  This recommended decision takes it as established that there are two defendants in the case.

[4]     The plaintiffs frequently request that statements be stricken based on the quality of the citation and/or based on the presence of "multiple allegations in the same paragraph."  The plaintiffs also advance this complaint as a ground for denying the defendants' summary judgment motion outright, without consideration of the facts.  (Pl.'s Objection at 2-3, ECF No. 63.)  I do not consider the number of "allegations" per paragraph to be a sufficient ground to strike these particular statements, which tend to track content found on a particular page of the record.  I have reworded some statements to drop content that is not supported by the citation or to make the statement conform to the cited material.  Additionally, some statements or portions thereof have been omitted because they appear immaterial to the discussion and are not employed by the parties in their respective memoranda.  I have not flagged every instance in which I have omitted or reworded statements and assume that the parties will bring to the court's attention any omissions or revisions that they believe are erroneous or prejudicial.

[5]     Citation of "Statement" is a reference to both the defendants' statement of material facts and the plaintiffs' opposition statement.  Citation of "Additional Statement" is a reference to both the plaintiffs' additional statement and the defendants' reply statement.

Statement ¶ 1.)  Beginning in March 2010, Michelle Tabbutt began assisting Treneer with team leadership.  Tabbutt focused on day-to-day tasks, conducted listenings, performed daily meetings, and discussed with the associates any specific issues on a particular account.  Treneer continued to be the manager of the group and performed both midyear and end-of-year evaluations.  (Statement ¶ 35.)

When Shelly logged into the system, it would tell her when her break times and lunch break(s) would be that day.  She had two breaks per day, lasting between 15 or 20 minutes, and one hour for lunch, though lunch was sometimes split into two 30-minute sessions.  She was not required to take her breaks in any particular location and could remain at her cubical if she wished.  (Statement ¶ 7.)

Shelly Flood and Castle met in 2008, when Castle was assigned to be Shelly's mentor through the Bank's[6] Lead for Women mentoring group, a professional organization designed to further women's professional development in the workplace.  Shelly testified that the mentoring relationship was focused on improving her communication skills, confidence, and professional presentation.  (Id. ¶ 9.)

In March 2009, around the same time Shelly Flood began her new position with ECCR, she met Keri Flood.  Keri was employed by ABM Janitorial Services Northeast, Inc., and was assigned to perform commercial cleaning services at the Belfast facility.  (Id. ¶ 10.)  On October 4, 2009, Shelly and Keri started dating and would spend break time together, particularly at lunch.  (Id. ¶ 12.)  Shelly and Keri would also visit briefly at Shelly's work in the afternoon.  Typically this amounted to a "drive by" and Keri would simply drop off a soda.  Sometimes they

---

[6]     Although there are two defendants, I have adopted the defendants' use of "Bank" to generically refer to both defendants.

would talk briefly, for no more than two or three minutes.[7]  (Id. ¶ 13.)  If Shelly was on the

phone, Keri would just smile, say hi, and walk away.  (Id. ¶ 14.)  Keri did not limit her social

visits to Shelly alone.  Keri would also drop off refreshments to other associates.  (Id.)  On

September 2, 2009, after a conversation Keri had with someone on the premises (not someone

working in the phone bank), Keri's ABM supervisor, Ed Dietrich, approached her and told her to

be polite but keep conversation to a minimum, including social conversations with bank

associates.  (Id. ¶ 15.)

In April 2010 there was a bank social event.  At this event Shelly Flood was volunteering

at the LGBT table and Castle was volunteering at the Lead for Women's table.  They "said

[their] pleasantries" and Castle observed a photo at the LGBT table in which Shelly and Keri

were either hugging or standing arm in arm.  The picture was taken at a local bar.  (Id. ¶ 17.)

Shelly says that Castle gave her a look of shock and walked away.  (Additional Statement ¶ 6.)

The picture was displayed on a bulletin board with several other photos.  Shelly and Castle did

not have a conversation.  (Statement ¶ 17;  Shelly Flood Deposition at 92, ECF No. 59-7,

PageID# 658.)  Castle later told the sponsor of the LGBT table that the picture was inappropriate

because alcohol was involved and the sponsor agreed.  (Additional Statement ¶ 7.)  Following

the social event, Castle no longer smiled at Shelly in the hallways, where the two had previously

been cordial and friendly.  Castle also made remarks about Shelly's hairstyle (e.g., "good job

doing an effort with your hair today") and her eating habits (asking her whether it was wise to

consume a bag of peanut M&Ms and commenting at a "food day" that she hoped Shelly was not

eating a second plate).  At mentoring meetings, Castle would inquire about Shelly's relationship

with Keri, such as when they started dating and how they were doing.  Castle never made any

---

[7]      Shelly and Keri offered somewhat conflicting testimony on this issue.  Shelly said they only had
conversations twice.  Keri said they had brief "social visits" lasting two or three minutes.  (Shelly Flood Deposition
at 232, ECF No. 59-9, PageID# 797;  Keri Flood Deposition at 45, ECF No. 59-1, PageID# 372.)

derogatory comments about Shelly's sexual orientation or about the fact of her relationship with Keri, but would frequently glare at Shelly and would give Shelly and Keri a disapproving look when she saw them together and comment about "always" seeing them together in the hallway. (Statement ¶ 18;  Additional Statement ¶¶ 11-14, 19;  Shelly Flood Deposition at 98, 102, PageID# 663-664, 667;  Shelly Flood Affidavit ¶¶ 6-8, 10, PageID# 1282.[8])  Shelly perceived what she regarded as ongoing daily harassment in the nature of snide and hurtful remarks and believed that the treatment was motivated by her sexual orientation.  She was finding it difficult to work in the environment as a result.  (Additional Statement ¶¶ 33-35.)

In late July or early August, Shelly and Castle had a meeting at which they addressed Shelly's goal of becoming a manager.  Castle told Shelly that she needed to keep her girlfriend away from her desk for perception purposes and that it would be better for Keri to hear it from Shelly than from Keri's supervisor.  Later in the meeting, Castle reiterated that if Shelly wanted to be a manager, it was "not a good idea to have your girlfriend hanging at your desk." (Statement ¶ 19;  Shelly Flood Deposition at 154, PageID# 719.)  At her deposition, Shelly testified that she found Castle's comment threatening, but would have seen it differently if Castle had said Keri should not be there because Keri was not part of the team.  (Statement ¶ 20;  Shelly Flood Deposition at 156.)  Shelly felt that Castle's statement was threatening because Castle suggested she would complain to Keri's supervisor if Keri did not stay away.  (Shelly Flood Aff. ¶ 14, ECF No. 63-2.)   Also in late July or early August, Castle told Shelly that she could no longer take time off the phone to attend LGBT affinity group meetings.  (Additional Statement ¶¶ 15-17.)

---

[8]      Shelly Flood's summary judgment affidavit characterizes Castle's behavior as "unpleasant," "insulting," "demeaning," and "hurtful" and says that Castle began to "interrogate" her about her relationship with Keri. (Additional Statement ¶¶ 11-12;  Shelly Flood Affidavit ¶¶ 11-14.)  These characterizations are not as useful as descriptions of actual behavior and words.

Shelly Flood states that she observed that other associates had significant others who worked at the Bank and who would visit each other at their work stations.  Her visits with Keri were of a comparable quality and duration.  (Statement ¶ 23;  Shelly Flood Aff. ¶ 13.)  She was unaware if other associates were ever spoken to about their social visits.  (Statement ¶ 23;  Shelly Flood Deposition at 161, PageID# 726.)  However, Shelly observed and overheard others talking openly about their personal lives during work hours, including one manager who frequently discussed her wedding plans in the summer of 2010.  Some co-workers asked Shelly about her own wedding plans because she and Keri had planned for a commitment ceremony in August 2010.  Shelly says she was instructed to keep all conversations about her personal life, such as her wedding, "off the floor."[9]  (Additional Statement ¶¶ 21-25.)

After being told not to have Keri hanging around her desk, Shelly and Keri made sure to keep their distance on the floor where Shelly worked.  (Id. ¶ 29.)  Despite this, Castle complained about Keri to Tim Wilson, who deals directly with ABM.  (Id. ¶ 31.)  As a result, Keri received a verbal warning from ABM on August 17, 2010.  (Id. ¶ 32.)  This verbal warning was memorialized in a written memorandum from Ed Dietrich to Keri Flood dated August 25, 2010.  (ECF No. 59-5 at 16, PageID# 558.)

Following Keri's receipt of the written counseling, Shelly contacted Regional Manager Brian King and requested a meeting.  Shelly was very upset because she assumed Castle had spoken to Keri's manager about her social visits despite asking Shelly to speak with Keri, which she had.  (Statement ¶ 26.)  During the meeting, Shelly told King that Castle had commented on her weight and attire and that she no longer found the mentoring relationship rewarding.  (Id. ¶

---

[9]     These additional statements generally track the averments found in Shelly Flood's summary judgment affidavit.  The defendants do not challenge the affidavit testimony, but deny many of the additional statements on the ground that there is "[n]o evidence in the record."  Shelly Flood's affidavit is evidence for purposes of summary judgment and because the defendants have not demonstrated any grounds for rejecting the affidavit testimony, their denials are ineffective.

27.)  Shelly asked King whether she should report the harassment and discrimination to the Bank's advice and counsel department and King instructed her not to.  (Additional Statement ¶¶ 37-38.)  King indicated that it was not a problem for Keri to stop by Shelly's desk.  (Id. ¶ 39.)

King discussed the situation with the Bank's HR manager, Peter Sims.  Sims indicated that he, personally, probably would not have raised the issue with Tim Wilson, as Castle had, though he did not see anything wrong in it, either.  (Id. ¶¶ 41-42.)

Later in August, King, Castle, and Shelly Flood met for a discussion.  (Statement ¶ 29.) King told Castle that she would no longer be Shelly's mentor.  (Id. ¶ 30.)  They also spoke about Castle's decision to relay her concern through Tim Wilson and how this was not the proper channel.  (Id.)  King told Castle to contact Dietrich[10] to apologize and rectify the situation. (Additional Statement ¶¶ 43-44.)  It was after this conversation that Keri received the written memorandum from Dietrich.  (Id. ¶ 45.)  Castle never again went to Shelly to raise any issue or complaint related to Keri's visits.  (Statement ¶ 32.)

In 2009, Shelly Flood received positive mid-year and year-end performance evaluations from Treneer.  (Id. ¶ 33.)  In April 2010 (coinciding with the bank social and Shelly's staffing of the LGBT table), Shelly received criticism from her managers for matters about which she had never before been criticized, such as for putting a customer on hold for less than a minute to research a question the customer asked.  (Additional Statement ¶ 47.)  In her view, calls that once would have been classified as "exceeds expectations" or "wow" would now be labeled "does not meet."  (Id. ¶ 48.)  Shelly Flood says the criteria are highly subjective.  (Id. ¶ 49.)

In or about August 2010, five minutes before the end of Shelly's shift, Castle demanded of Treneer, in Shelly's presence, that he place Shelly on verbal warning before she left for the

---

[10]      The record is unclear as to whether King advised Castle to contact Wilson or Dietrich.  Castle says she was to talk to Wilson.  (Castle Deposition at 53, PageID# 930.)

day, for a putative error on a certain account reflected in Shelly's loan review sheet.  Treneer then informed Shelly that she was being put on verbal warning.  The alleged error had been on her loan review sheet for at least two weeks, but no one had asked her about it.  Shelly was easily able to prove that she had nothing to do with the account and that the error should not have been placed on her sheet.  (Id. ¶¶ 51-54.)

On August 10, 2010, Tabbutt gave Shelly two "does not meet" grades for calls that warranted a better grade, in Shelly's experience.  (Id. ¶ 76.)

On September 7, 2010, Shelly received a written "verbal warning" for failure to meet her "CPPH" (calls per productive hour) goals for April, June, and July 2010.  (S. Flood Dep. Ex. 22, PageID# 861.)  The warning (which was placed in her file) threatened:  "Failure to meet expectations may result in further disciplinary action up to and including termination." (Additional Statement ¶¶ 55-56.)  The warning was delivered by Treneer and Tabbutt. (Statement ¶ 40.)  However, Shelly had received a positive mid-year review from Treneer in August 2010, with no mention of any failure to meet her CPPH goals.  (Castle did not participate in the mid-year review.)  (Id. ¶ 38;  Additional Statement ¶ 57.)  Consequently, prior to September 7, Shelly understood that she had met the CPPH goal because some of the hours counted against her for purposes of the warning had been preapproved as "aux" time by Tabbutt, aux time being time in which an associate attends to necessary work that does not involve customer calls.  However, in September, Castle retroactively disapproved some aux hours previously approved by Tabbutt, so that Shelly's CPPH score no longer reflected that she met expectations.  When Shelly explained what had happened to her direct managers, they responded that they knew and that there was nothing they could do.  (Additional Statement ¶¶ 59-65.) Discussions about reducing aux time were common.  (Statement ¶ 37.)  The writing

commemorating the September warning stated:  "Shelly and I have had several conversations surrounding efficiency, in addition to schedule adherence."  (Id. ¶ 42.)  Tabbutt informed Shelly that Tabbutt had failed to obtain Castle's prior approval before permitting Shelly to take aux time.  (Statement ¶ 44.)  Shelly does not know how many hours were disapproved by Castle.[11] (Statement ¶ 45.)  Prior to this incident, Shelly had never received any warning or other disciplinary action from the Bank for any reason.  (Additional Statement ¶ 68.)

Castle testified at her deposition that it would have been standard procedure for her to contact the Bank's Advice and Counsel Department prior to Shelly receiving this warning. There is a document reflecting that Castle placed such a call on September 3, 2010, ahead of the delivery of the warning, and that a manager would issue a written warning for unsatisfactory performance.  The document also indicates that the "manager" stated that Shelly received a verbal warning in June, but this is not consistent with the summary judgment record put forward by the defendants, which fails to reflect any June verbal warning.[12]  Shelly posits that Castle misinformed Advice and Counsel as to the circumstances and as to the existence of a prior warning.  That is one reasonable inference that might be drawn from the evidence.  (Id. ¶¶ 69-71; Castle Dep. Ex. 8, PageID# 1065.)

After this, Shelly began applying for other positions with the approval of Jeremy Treneer. Castle has testified that she lacked the power to block any such applications, but she spoke with one recruiter to say that Shelly was challenged to meet her current goals and would need to focus on meeting her current goals before taking on additional responsibility.  (Additional Statement ¶¶ 73-75.)

---

[11]     The record states that the CPPH goal was set at 4.75 calls per hour at the time in question and that, with the aux hours denied, Shelly Flood's scores were 4.67 for April, 4.56 for June, and 4.63 for July.

[12]     There is evidence that Treneer, in a 2010 evaluation, noted that "Shelly needs to reduce the amount of unscheduled aux."  (Statement ¶ 36;  2010 Manager Performance Review, PageID# 859.)  However, this is not evidence of a warning for failure to meet a performance metric.

On September 21, 2010, Shelly learned that Tabbutt had assessed her as not meeting expectations on a call and believed the assessment was not warranted.  (Id. ¶ 78.)  Shelly perceived that she would be fired based on the latest negative assessment by Tabbutt and felt distraught because she felt she was being subjected to a unique set of standards in order to end her employment.  (Id. ¶¶ 81-82.)  Later that day, Shelly attended a meeting with Tabbutt and a few other teammates to discuss goals for the month.  (Id. ¶ 85.)  After the meeting concluded, Tabbutt mentioned her wedding plans, and one of the women made reference to a penis shot glass at her bridal shower.  The conversation included other topics like lingerie, bucks and does, and testosterone.  Shelly felt uncomfortable with the conversation, and requested to be excused, but Tabbutt refused, saying Shelly could "deal."  Shelly testified that she cannot "knowledgeably speak about" whether Tabbutt kept her from leaving based on her sexual orientation.  (Id. ¶¶ 86-88;  Statement ¶ 47.)  According to Shelly, this meeting "sealed the deal on how much [she] could tolerate with the outcast feeling [she] was having."  (Statement ¶ 48.)  From Shelly's perspective, Tabbutt was rubbing Shelly's nose in the fact that everyone else could discuss their love lives at work, whereas she had been advised by Tabbutt not to talk about her own relationship during work hours.  (Id. ¶ 49;  Additional Statement ¶ 89.)

Shelly worked on September 22, tied up loose ends, and did not report on September 23.  (Statement ¶ 50.)  According to Shelly, she was unable to return or to call and talk to her supervisors because of emotional upset.  (Additional Statement ¶¶ 90-91;  Statement ¶ 53.)  Shelly did not call the 1-800 work hotline and failed to notify her managers of her absence.  (Statement ¶ 51.)  Shelly received two voicemail messages concerning her absence, one from Castle and the other from Tabbutt, but did not return their calls.  (Id. ¶ 54.)

The same document that indicates Castle called Advice and Counsel on September 3 records another call from Castle on September 23.  It records that Shelly "will be progressing to [final written warning] at the end of the month."  (Additional Statement ¶ 93.)

On Tuesday, September 28, 2010, Treneer sent Shelly a letter saying that he would assume she had voluntarily resigned and would separate her employment if he did not hear from her within three days.  (Statement ¶ 58;  Letter, PageID# 862.)  Shelly remained out of work and wrote a lengthy letter addressed to Diana Castle on September 30, 2010.  She hoped the letter would prompt an investigation.  (Additional Statement ¶¶ 94-94;  Shelly Flood Dep. Ex. 24, PageID# 863-66.)  Shelly wanted to continue working at the Bank, but not if she had to endure the treatment she was receiving.  (Additional Statement ¶ 97.)

The defendants state that Shelly Flood's letter was the first indication that she believed she was treated differently because of her sexual orientation and that she nowhere indicated in her letter that she wanted to return.  (Statement ¶ 60.)  This is contrary to Shelly's statement that she raised the issue with King at her August meeting with him.  It is also contrary to Shelly's letter, which indicates that she tried to get issues resolved with King, but that it seemed only to fuel the fire.  Additionally, the letter related that Shelly sought a different position in the Bank, wanted to find a solution and be part of the team, saw her job as her career, had not expected her "lifestyle" would interfere with her advancement, and "was being retaliated against and judged on [her] personal life's choices."  (PageID# 865-66.)

On October 1, Shelly received a voice message from HR manager Peter Sims.  She called back but the two never talked.  Sims referred the matter to Shelly Treppa, a case manager.  Over the next few days, Treppa called and left messages for Shelly and Shelly called and left messages for Treppa, but they never talked.  (Statement ¶¶ 61-64;  Additional Statement ¶¶ 98-99.)

11

Castle recommended that they follow the job abandonment process, but says she did not recommend termination.  It was decided that Shelly would be classified as having abandoned her job as of October 1, 2010.  (Statement ¶ 66.)  Job abandonment was the reason for separation provided to the Maine Human Rights Commission while Shelly's charge of discrimination was pending there.  (Additional Statement ¶ 103.)  According to Shelly, she learned of this classification "via computer" in early October.   (Id. ¶ 100.)

The Floods' counsel deposed Kimberly Norton, a team manager for the Bank's Advice and Counsel Department, designated as a representative to address certain matters.  Norton testified:  "Generally if there was an ongoing investigation, we would not separate the associate.  However, if an associate is separated, it still does not mean that if an investigation is completed and something was not done correctly that we still could not reverse, you know, a separation."  (Id. ¶ 101;  Norton Deposition at 25, ECF No. 63-8, PageID# 1305.)  Shelly's position is that she was terminated under circumstances that should have resulted in an investigation into her allegations of sexual orientation discrimination.  (Additional Statement ¶ 102.)

Shelly Flood sought other employment beginning in October 2010.  The defendants state that in no instance did Shelly disclose "job abandonment" as the reason for her separation from the Bank.  (Statement ¶¶ 67-70.)  Shelly does not supply any evidence that she did so in either her opposition statement or her additional statement.

*Keri Flood's termination at ABM Janitorial Services Northeast*

According to Diana Castle, on or about October 7, 2010, a pregnant ECCR associate in Castle's department named Trista Jackson told Castle that Keri Flood had been bumping into her in the hallway for a period of time and that, recently, Keri had attempted to trip her in a stairwell using a vacuum cleaner cord.  Castle contacted various bank security personnel both within the

Belfast facility and in Charlotte, North Carolina to relay the complaint.  Among the individuals notified of the matter was Peter Roper, the protective services manager at the Belfast facility. (Statement ¶¶ 71-74;  Additional Statement ¶¶ 104, 107.)  As a result of an interview with Jackson, Roper found Jackson credible.  However, Roper requested that camera footage of the stair be reviewed and it was reported back to him that the footage was reviewed and there was no video evidence of the tripping event.[13]  (Statement ¶¶ 81-82.)  Roper also knew Keri and had never known her to shove, trip, or otherwise assault anyone.  (Additional Statement ¶ 119.) Nevertheless, Roper contacted Dietrich and requested that Keri Flood no longer clean any of the Bank of America buildings in the Belfast campus.  According to Roper, he did not supply Dietrich with a reason.  (Id. ¶ 122;  Statement ¶ 83.)  The decision to bar Keri from the premises was within Roper's authority.  (Statement ¶ 84.)  Dietrich notified Keri that her employment with ABM was ended.[14]  (Id. ¶ 88;  Additional Statement ¶ 128.)  Subsequently, Keri spoke with ABM's vice president of human resources and labor relations, Robert Kinsley, who informed her of the nature of the allegations.  (Flood Deposition at 63, ECF No. 59-1, PageID# 390.)

Email exchanged between Dietrich and Kinsley reflects that Dietrich at some point was informed that there were allegations of inappropriate comments directed at a bank employee that could be construed as threatening, a series of five shoulder bumps or collisions, a most recent collision on a staircase, an indication that the bank employee was pregnant, an indication that the behavior was intentional, and a statement that the police would be called if Keri came onto the premises again.[15]  (Additional Statement ¶¶ 123-126.)

---

[13]    The media on which the video was recorded has since been erased or recorded over.  (Additional Statement ¶ 118.)

[14]    At her deposition Keri testified that Kinsley notified her who was making the allegations against her.  The email records reflect that Dietrich called Keri and told her she was terminated and that it was based on "some alleged altercations with a Bank of America employee."  (PageID# 1167.)

[15]    The plaintiffs have cited a printed copy of an email exchange between Dietrich and Kinsley but have not cited any authenticating deposition testimony or affidavit, which has been noted by the defendants in series of

According to the defendants, the alleged incident between Keri Flood and Trista Jackson stemmed from a workplace disagreement between Shelly Flood and Jackson.  (Id. ¶¶ 78-79.) According to Keri Flood, the incident never occurred and is a complete fabrication.  In her view, the natural inference is that the incident was fabricated by Jackson at Castle's behest. (Additional Statement ¶¶ 106, 114.)  Keri testified at her deposition that she does not know whether the Bank reported to anyone other than ABM that she had bullied or assaulted a bank employee.  (Statement ¶ 87.)  Flood has no knowledge of anyone at the Bank making any comments about either Shelly Flood's or her own sexual orientation.  (Id. ¶ 88.)

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in her favor. Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  Because many factual disputes depend on circumstantial evidence, to determine whether a fact is established, circumferentially, the Court will draw all reasonable inferences in favor of the non-movant that can be supported by the record sources she cites.  However, where the non-movant bears the burden of proof, she still must present "definite, competent evidence" from which a reasonable person could find in her favor.  United States v. Union Bank for Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007).  If the Court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and

---

"qualifications."  There are no requests to strike the statements, however.  I have not treated this qualification as a viable evidentiary objection or as a request to strike in light of the fact that the email exchange is among the exhibits attached to the parties' stipulation concerning the "joint record."  (Joint Record, ECF No. 59; Joint Record Exhibit K, ECF No. 59-21.)  As a stipulated record, I assume that the plaintiffs would be capable of admitting the document at trial and have legitimately relied upon it for purposes of summary judgment.

summary judgment must be denied to the extent there are supported claims.  Unsupported claims
are properly dismissed.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the
principal purposes of the summary judgment rule is to isolate and dispose of factually
unsupported claims or defenses.").

### DISCUSSION

The Bank[16] seeks summary judgment against Shelly Flood's discrimination claim on the
grounds that it never subjected her to any adverse employment action or severe or pervasive
harassment.  It seeks summary judgment against Shelly Flood's defamation claim on the grounds
that it was true to classify her departure as job abandonment and that there was no self-
publication of defamatory information, contrary to her allegations.  As for Keri Flood's claims,
the Bank argues that it is entitled to summary judgment because she cannot prove that the Bank
knowingly or with reckless disregard made false statements to ABM, or that defamatory
statements were ever published beyond the scope of privileged communications between the
Bank and ABM, or that any statement was ever made at all concerning why the Bank barred Keri
from its premises.  (Motion at 2, ECF No. 61.)

**A.     Shelly Flood's Claims (counts I and II)**

Shelly Flood advances two counts against the Bank.  In her first count she alleges adverse
employment actions, including "laying the groundwork for her termination" and harassment
motivated by supervisor animus toward her because of her sexual orientation.  (Amended
Complaint ¶¶ 11-12, ECF No. 34.)  She alleges wrongful termination on or about October 1,

---

[16]     Again, there are in fact two related bank defendants, Bank of America Corporation and FIA Card Services
NA.  The summary judgment motion does not attempt to establish as an undisputed fact that Bank of America is an
inappropriate defendant, although defense counsel represent, in conclusory fashion, that Bank of America was
wrongly named a defendant.
        As for the claims against ABM Janitorial Services Northeast, on April 17, 2013, the parties entered a
stipulation of dismissal, with prejudice, of all claims against ABM.  (ECF No. 64.)  Consequently, counts III and IV
are no longer viable.

2010, although she elected to stop reporting to work before that date.  (<u>Id.</u> ¶ 14.)  In her second count, Shelly alleges that the Bank has published false and defamatory statements concerning her occupational and professional fitness, specifically that she abandoned her job.  (<u>Id.</u> ¶ 21.)

### 1.   *Employment discrimination (count I)*

The Maine Human Rights Act prohibits discrimination in employment on account of sexual orientation.  5 M.R.S. §§ 4571, 4572(1).  Employers engage in unlawful employment discrimination when, among other things, they "discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment."  <u>Id.</u> § 4572(1)(A).  Discrimination can take many forms, but most broadly stated for existing employees (as opposed to prospective hires), proof of discrimination entails (1) membership in a protected class;  (2) employer imposition of an adverse employment action;  and (3) evidence that the adverse employment action was based in whole or in part on membership in a protected class.  <u>Doyle v. Dep't of Human Servs.</u>, 2003 ME 61, ¶ 14, 824 A.2d 48, 54 (describing the prima facie standard in the context of a disability discrimination claim).

In this case, it is undisputed that Shelly Flood is a member of a protected class.  The disputed issues concern the existence of an adverse employment action and evidence of a discriminatory motivation.  Shelly Flood contends that the following adverse employment actions were imposed:  supervisor harassment over a period of months, unfair use of heightened work-evaluation standards and expedited implementation of the Bank's progressive discipline process, and discharge from employment.  (Pl.'s Objection at 5-6, ECF No. 63.)  As for discriminatory motivation, Shelly points to (1) evidence that Castle's treatment of her changed for the worse following the April 2010 bank social at which Castle saw Shelly at the LGBT table

and observed a photograph of Shelly and Keri embracing;  (2) discontinuation of authorization

for Shelly to participate in the LGBT affinity group during work hours;  (3) Castle's attempt to

prevent Keri and Shelly socializing at all at Shelly's workstation;  (4) unfair retroactive revision

of Shelly's "aux hours" to bring Shelly's CPPH score below expectations;  and (5) "fast-track"

application of the progressive discipline system.  (Id. at 8-9.)

Shelly Flood's presentation has certain flaws.  For example, the facts do not reasonably

warrant a finding that she was constructively discharged from employment or that she suffered

the sort of objectively severe or pervasive harassment that would support a "hostile work

environment" claim.  The closer issue is whether the evidence is sufficient to allow a jury to

conclude, without resort to speculation, that Diana Castle subjected Shelly Flood to materially

adverse treatment related to the terms, conditions, or privileges of employment within the

meaning of the Maine Human Rights Act and that this treatment was motivated by

discriminatory animus toward Flood's sexual orientation.

> a.    Constructive discharge

Under Maine law, "discharge" includes a circumstance in which "the employee has no

reasonable alternative to resignation because of intolerable working conditions."  King v. Bangor

Fed. Credit Union, 611 A.2d 80, 82 (Me. 1992).  "The test is whether a reasonable person facing

such unpleasant conditions would feel compelled to resign."  Id.  Generally referred to as a

"constructive discharge," this theory of relief enhances the potential damages (lost wages) a

plaintiff may recover when the plaintiff has chosen to resign without actually being fired by the

employer.  Levesque v. Androscoggin County,  2012 ME 114, ¶ 8, 56 A.3d 1227, 1229 (citing

Bodman v. Maine, 720 F. Supp. 2d 115, 123 (D. Me. 2010)).  The constructive discharge

standard is more exacting than the hostile work environment standard, which is itself demanding

17

in its requirement of severe or pervasive hostile treatment, as discussed below.  See Pa. State Police v. Suders, 542 U.S. 129, 146-47 (2004) (describing constructive discharge as "an aggravated case" of harassment or hostile work environment);  Gerald v. Univ. of P.R., 707 F.3d 7, 18, 25-26 (1st Cir. 2013) (holding that jury could have found hostile work environment, but not constructive discharge).  Viewed objectively, the evidence in this case does not reasonably support a finding that an individual of ordinary firmness would have felt compelled to resign. Among other things missing from the factual presentation, there is no evidence of severe mistreatment or a pervasively hostile work environment.  Shelly Flood was not humiliated in front of her peers or even subjected to sexual-orientation-specific teasing or insult  by a supervisor or anyone else at the Bank.  Moreover, the sorts of conditions that Shelly Flood was subjected to, even on her version of the facts, were the sort of conditions that an employer could impose across the board on all employees, such as barring social visits at work stations, disallowing participation in affinity groups during work hours, imposing exacting performance standards, or subjecting employees to the occasional boorish discussion of a supervisor's wedding plans.

> ### b.    Hostile work environment

Proof of a hostile work environment claim requires evidence demonstrating, among other things, harassment based on membership in a protected class that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment, viewed objectively.  Watt v. UniFirst Corp., 2009 ME 47, ¶ 22, 969 A.2d 897, 903. With respect to the severity and pervasiveness of the conduct in question, a court must undertake an "examination of 'all the circumstances, including the frequency of the discriminatory conduct; its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance.'" Id. ¶ 23

(quoting Doyle, 2003 ME 61, ¶ 23, 824 A.2d at 56).  See also Black v. State, 2005 ME 32, ¶¶ 9-

11, 868 A.2d 234, 238 (affirming summary judgment against hostile work environment claim

despite significant tension and conflict between plaintiff and her supervisor).  Viewed

objectively, the evidence in this case does not reasonably support a finding of hostile work

environment.  The evidence does not divulge severe harassment or pervasive harassment, any

physical threats, any humiliating treatment, or any offensive utterances.  This is not to say that

the record is utterly devoid of what could be called "harassment."  The point is that the evidence

does not support a finding of severe or pervasive harassment.

c.    Discrimination in terms, conditions, or privileges of employment

With constructive discharge and hostile work environment removed from the case, what

remains are chilled social interaction between Castle and Flood, non-class-specific put downs

from Castle, negative subjective evaluations despite a history of positive evaluations, retroactive

manipulation of performance data to support issuance of a written warning, a false representation

to accelerate application of the progressive discipline system, a temporary bar on social visits

from Keri, and a bar on continued participation in the LGBT affinity group during work hours.

The Bank contends that these circumstances did not materially change the conditions of Shelly

Flood's employment because Flood was not demoted, transferred or reassigned, denied a

promotion, or subjected to unwarranted negative job evaluations resulting in any tangible

consequences.  (Motion at 11-12.)

For purposes of the prima facie burden, the evidence in this case does raise the question

of whether Flood was subjected to unwarranted negative job evaluations.  The evidence also

suggests that the Bank was preparing to apply its progressive discipline system in an accelerated

19

fashion, based on a false representation from Castle concerning the existence of a June 2010 verbal warning.  Castle is at the vortex of the negative evaluation related to Shelly's calls-per-productive-hour (CPPH) score because Castle retroactively overrode certain "aux hours" permitted by one of Shelly's team leaders, thereby transforming a once positive job evaluation into a negative evaluation.  In addition, there is evidence that could support a finding that Castle denied Shelly periodic social visits at her workstation and denied her continued participation in the LGBT affinity group during work hours.  However, the evidence does not demonstrate materially adverse employment actions.

"Actions adverse to employment are recognized as those that 'adversely affect the employee's compensation, terms or other conditions of employment.'"  LePage v. Bath Iron Works Corp., 2006 ME 130, ¶ 20, 909 A.2d 629, 636 (quoting DiCentes v. Michaud, 1998 ME 227, ¶ 21, 719 A.2d 509, 516 (addressing whistleblower claim)).

> An employee has suffered an adverse employment action when the employee has been deprived either of "something of consequence" as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld "an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service."

Id. (quoting Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996) (addressing retaliation claim)).[17]

I begin with the social visits and the affinity group participation.  On one version of the facts, social visits involving heterosexual partners were permitted but Shelly and Keri's were not.  At the same time, the record supports a finding that Castle opposed Shelly's continued

---

[17]    The Maine Whistleblowers' Protection Act, which was at issue in LePage, does not include the "any other matter directly or indirectly related to employment" clause that is found in the Maine Human Rights Act.  However, a violation of the Whistleblowers' Protection Act is only made actionable because of language found in the Maine Human Rights Act.  See Fuhrmann v. Staples the Office Superstore E., Inc., 2012 ME 135, ¶ 14, 58 A.3d 1083, 1090.  Maine Supreme Judicial Court decisions do not suggest that the standard for judging adverse employment actions is higher for whistleblower claims than for other discrimination claims.

participation in the LGBT affinity group during work hours.  These social restrictions are not actionable adverse employment actions because they did not impose on Shelly something of consequence to the employment relationship on par with a demotion or reduced pay, or withhold something of consequence on par with consideration for a promotion.

The other mistreatment alleged by Shelly Flood concerns negative employment evaluations.  Under federal law, unwarranted negative evaluations <u>are</u> recognized as adverse employment actions, <u>Hernandez-Torres v. Intercontinental Trading</u>, 158 F.3d 43, 47 (1st Cir. 1998), at least in the context of retaliation claims, but there is precedent to the effect that even unwarranted negative evaluations must yield some "tangible" consequences, <u>Bhatti v. Trs. of Boston Univ.</u>, 659 F.3d 64, 73 (1st Cir. 2011).[18]  In this case there was a warning that could be found unwarranted and that warning was cited by the supervisor as grounds to advance Flood on the Bank's progressive discipline plank.  Additionally, there is a separate "negative evaluation" that Castle communicated to a recruiter who inquired about Flood in connection with Flood's attempt to transfer.  Nevertheless, such evidence still falls short of the kind of materially adverse employment action discussed in <u>LePage</u> and <u>Bhatti</u>.  A negative evaluation without a corresponding change in pay or other material adverse change in employment status is insufficient to support a prima facie case of sexual orientation discrimination.

---

[18]      The "unwarranted negative job evaluation" concept appears to originate in an employment discrimination treatise.  <u>See</u> <u>Wyatt v. City of Boston</u>, 35 F.3d 13, 15-16 (1st Cir. 1994) (citing 3 Arthur Larson & Lex K. Larson, Employment Discrimination § 87.20, at 17-101 to 17-107).  It is most commonly recited in retaliation cases, which have, since 2006, been subject to a lower standard of proof, calling for evidence that the employer engaged in an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 63, 57 (2006).  Shelly Flood attempted, late in the game, to amend her complaint to allege a retaliation claim, but I denied her motion as untimely because all of the factual predicates were known to her long before the motion was filed and there was no good cause for the delay.  (Order on Mot. to Amend, ECF No. 55).  My order was never appealed.  Consequently, I have not addressed herein whether the retroactive revision of Shelly's positive evaluation and the related warning were the sort of actions that would dissuade a reasonable worker from making a discrimination charge.  I do note, however, that <u>Bhatti</u> was a retaliation case and it is the case that, in this circuit, illustrates the requirement of "some objectively and materially adverse action," such as a reprimand that carries with it some "tangible consequences."  <u>Bhatti</u>, 659 F.3d at 73.

These kinds of impositions are in the nature of supervisor harassment that falls short of both the adverse employment action standard and the hostile work environment standard. This kind of harassment should be addressed with human resources or EEOC personnel and if no action is taken, or if a tangible adverse action evolves, such as termination, demotion, loss of hours, or other materially adverse, tangible consequence, then these previously intangible indignities will have become materially adverse. Here, however, Shelly Flood appropriately raised the matter of social visits with King and King indicated that Keri need not be barred from Shelly's workstation. As for LGBT affinity group participation, Shelly Flood has not indicated whether she addressed that issue with King or what happened in that regard. She has failed, in other words, to develop that aspect of her case. Finally, following Castle's modification of her evaluation Shelly stopped coming to work. If an adverse employment action was in the offing, Shelly prevented it from occurring. Because Shelly was not subjected to a materially adverse employment action, she fails to carry her prima facie burden.

I draw the preceding conclusion subject to one caveat. Maine law prohibits discrimination in regard to "the terms, condition, or privileges of employment," or in regard to "*any other matter directly or indirectly related to employment*." 5 M.R.S. § 4572(1)(A) (emphasis added). Federal employment discrimination law, by comparison, does not contain the "any other matter" clause found in the Maine Human Rights Act. See, e.g., 42 U.S.C. § 2000e-2(a)(1) (Title VII). The parties have not cited any precedent of the Maine Supreme Judicial Court that discusses this difference. Nor has my own research uncovered any. I decline to read the Maine statute in an expansive fashion that would treat the affronts or slights at issue in this case as adverse employment actions even in the absence of materially adverse consequences. I note, however, that although the Maine Supreme Judicial Court generally looks to federal

precedent construing federal anti-discrimination law when it addresses new legal issues arising under the Maine Human Rights Act, it has also departed from federal precedent in situations where it has found the language of the Maine Human Rights Act to be more expansive than the language of its federal analogues.  See Whitney v. Wal-Mart Stores, Inc., 2006 ME 37, 895 A.2d 309.

     d.     Discriminatory animus as cause

     Although I conclude that Flood does not present sufficient evidence of an adverse employment action to support a claim for discrimination, for the sake of completeness and because the Court might reject my conclusion regarding an adverse employment action, I consider whether Flood has generated sufficient evidence of discriminatory animus.  Flood must present sufficient evidence to permit a finder of fact to conclude that the conduct she experienced was the product of discriminatory animus.  The court's role in this is simply to determine whether there is a version of the facts that enables a verdict for the plaintiff.  Like federal law, Maine law uses the McDonnell Douglas framework to determine whether there exists a genuine issue of discriminatory animus.  Trott v. H.D. Goodall Hosp., 2013 ME 33, ¶ 15;  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

> Under that framework, (1) the employee bears the initial burden to produce evidence that unlawful discrimination motivated the employer's adverse employment action against the employee;  (2) if the employee meets that burden, the burden shifts to the employer to produce evidence of a legitimate, lawful reason for the adverse employment action;  and (3) if the employer meets that burden, the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action.

Trott, 2013 ME 33, ¶ 15.

     The evidence is sufficient to support Flood's initial burden of showing unlawful motivation.  In late July or early August, Castle told Flood that reaching the ranks of

management would be difficult if Flood had a girlfriend hanging at her desk, due to perceptions. Castle also took steps to keep Keri Flood away from Shelly's workstation but, on one version of the facts, tolerated similar visits involving heterosexual associates. Following Shelly's appeal to King, who overrode Castle's dictate concerning Keri, Castle wrongly demanded that one of Shelly's team leaders place Shelly on verbal warning for something that Shelly was readily able to show was not her responsibility. Coinciding with this treatment, Shelly's other team leader, the one who monitored calls, became more critical of Shelly's call performance. Shortly thereafter, Castle retroactively modified Shelly's performance data related to prior months, months that were already positively evaluated, and set the stage for a written warning, something never before imposed on Shelly. The timing and circumstances are sufficiently probative of bias to carry the initial burden.

The Bank's burden of providing a legitimate reason for the treatment in question is a burden of production, not a burden of proof. Concerning Castle's effort to keep Keri away from Shelly's workstation, the Bank says that "it was management's judgment that these daily visits for non-business related purposes became an unnecessary distraction that may have contributed to [Shelly] Flood's declining efficiency scores." (Motion at 12.) This is a curious assertion because there is no corresponding statement that Castle was even subjectively concerned about any declining efficiency scores at that time. As for the CPPH efficiency scores themselves, the Bank says that Shelly's scores in fact dropped for three months in a rolling six-month period and that Shelly's personal perspective cannot suffice to undercut this evaluation. (Id. at 16.) Although the Bank acknowledged in its statement the issue of Castle's retroactive denial of previously approved aux time in connection with Shelly's CPPH warning (Statement ¶¶ 41-45), the Bank offers nothing in its memorandum to justify Castle's retroactive maneuver. It does not

raise any neutral, non-discriminatory assertion about the standard it applied with respect to aux hours.  Nor does the Bank mention this matter in its reply memorandum although Shelly Flood clearly relies on the retroactive nature of this measure to support her presentation.  Although the burden of persuasion never falls on the Bank, to carry its burden of production at step two of the McDonnell Douglas analysis the Bank "must clearly set forth, through the introduction of admissible evidence, the reasons" why it imposed an adverse action.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).  Here, the Bank simply states that Shelly missed the CPPH mark for April, June, and July 2010, without explaining why the aux hours were modified or how the team leader erred in initially approving the aux hours.  The Bank's step-two showing certainly begs the question of what Castle's reasons were and why she would have retroactively amended any particular aux hours or sanctioned Shelly for aux time that Tabbutt approved.  Nevertheless, I will proceed with the analysis on the assumption that the Bank has carried its burden at step two.

Shelly's final burden is to demonstrate that the legitimate reasons offered by the Bank are pretexts for discrimination.  To meet this burden, Shelly "need only assert sufficient facts, supported in the summary judgment record, from which a reasonable fact-finder *could* disbelieve the employer's proffered rationale and conclude that illegal discrimination was the true motivating factor."  Cookson v. Brewer Sch. Dep't, 2009 ME 57, ¶ 23, 974 A.2d 276, 284. "[T]he generation of an issue of fact regarding the veracity of the employer's explanation is sufficient to repel a motion for summary judgment."  Id. ¶ 16 n.3.

The Bank says that Shelly has failed in this regard because she never identified the alleged co-workers who were permitted to have visits from significant others at their workstations.  (Reply at 3, ECF No. 65.)  The Bank also asserts that the only way for Shelly to

prove discrimination would be for her to identify a heterosexual associate who failed to meet the CPPH goals and did not receive a warning.  (Id.)  The Bank complains that there "is not an iota of evidence suggesting that others similarly situated . . . in all relevant respects were treated differently by the Bank in any material way."  (Id.)

It is true that Shelly's presentation is not solidified with clear evidence that Castle tolerated comparable socialization involving any particular heterosexual associate at his or her workstation.  However, Shelly does maintain that she observed first hand that others were permitted visits when she was not (although it appears the other visits were between bank employees).  Her failure to name other associates or her lack of supportive witnesses is an issue of weight.  Her sworn assertion that she observed the socializing is sufficient for present purposes.  It is also true that Shelly has not identified a heterosexual associate with no prior warning history who missed the CPPH goal for three months in a rolling six-month period without being issued a warning.  This is the more difficult challenge for Shelly because her summary judgment presentation does not suggest that she investigated the standard that Castle would have relied upon to deny any particular aux hours.  On the other hand, Shelly is permitted to prove her case circumstantially.  Under the MHRA the prima facie standard does not require direct proof of disparate treatment, Doyle, 2003 ME 61, ¶ 14, 824 A.2d at 54, and an adequate showing of pretext is sufficient to stave off summary judgment.  Cookson, 2009 ME 57, ¶ 16, 974 A.2d at 282 & n.3.  See also Ugurhan Akturk Kosereis v. Rhode Island, 331 F.3d 207, 213-14 (1st Cir. 2003) (explaining that disparate treatment of similarly situated fellow employees is not required to make out a prima facie case and that such evidence is only one way to demonstrate pretext).

Some of the evidence could fairly be regarded as probative of pretext.  A jury could conclude on this evidence that Castle took affirmative measures to undermine aspects of Shelly Flood's employment, first by imposing a no visitation rule in relation to Keri stopping at Shelly's workstation (understanding that Keri and Shelly were in a romantic relationship), then by misrepresenting the existence of a prior warning and retroactively denying aux hours that had been approved by a team leader.  The retroactive nature of the aux hours change, the timing of the change in relation to King's intervention on Shelly's behalf, the fact that a team leader previously approved the aux hours and positively evaluated Shelly's performance for the months in question, and Castle's misstatement concerning the existence of a prior warning could support an inferential finding that the CPPH-basis for the negative evaluation was false or was being manipulated by Castle as a means of setting up Shelly for termination and a related finding that Castle harbored animus toward Shelly based on Shelly's sexual orientation.  This all assumes, of course, that the finder of fact would view all of the evidence in the light most favorable to Shelly Flood and draw the inferences in her favor as well.

Ultimately, the problem with Shelly Flood's employment discrimination case is not that there is insufficient evidence to support a finding of discriminatory animus on the part of her supervisor. The problem, as set forth previously and elaborated on in the following discussion of the defamation claim, is that the case is devoid of a tangible adverse employment action.  Shelly may have correctly read the writing on the wall and Castle may have been in the process of setting up a wrongful termination or other tangible result, but Flood did not wait for that to happen.

### 2.     *Defamation (count II)*

The Bank states that Shelly Flood's defamation claim is premised entirely on the idea that she was compelled to self-publish statements indicating that she "abandoned" her job.  (Motion at 17.)  The Bank says the claim is not viable because there is no evidence of self-publication and because such a statement, if made, was not false.  (Id. at 18-20.)  Assuming a self-publication theory is made out, the Bank says it is protected by a conditional privilege on the facts of this case.  (Id. at 20-22.)  To the extent Shelly might wish to base her claim on the Bank's report to the Maine Unemployment Commission that Flood abandoned her job, the Bank says that such a report is absolutely privileged.  (Id. at 19-20, citing 26 M.R.S. § 1047.)  Shelly's response is that she was defamed as a job abandoner because the classification was accessible on the Bank's computer system and because the classification was communicated to the Maine Human Rights Commission (she does not base her claim on publication to the Unemployment Commission). (Pl.'s Objection at 11.)  Shelly also says that a self-publication claim is made out, though she makes no effort to demonstrate any actual self-publication.  (Id. at 12-13.)  In support of her position she cites the recommended decision that issued[19] in Swift v. Bank of America, No. 1:08-cv-00035-JAW, 2009 U.S. Dist. Lexis 22499, 2009 WL 723521 (D. Me. Mar. 16, 2009).

The elements of defamation are:  (1) a false and defamatory statement concerning another;  (2) an unprivileged publication to a third party;  (3) fault amounting at least to negligence on the part of the publisher;  and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.  Cole v. Chandler, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193.  As for the fourth element, "words written falsely about

---

[19]     The parties to the Swift litigation filed a stipulation of dismissal following the recommended decision.  The court did not have occasion to adopt or reject the recommendations made therein.

a person's profession, occupation, or official station constitute libel *per se*," and therefore a showing of special harm is not required.  Id.

The question of whether a statement is capable of conveying a defamatory message is a question of law.  However, whether the statement is true or false typically depends on factual findings.  Morgan v. Kooistra, 2008 ME 26, ¶¶ 26-28, 941 A.2d 447, 455.  A defamatory statement is one that lowers the reputation of the plaintiff in the estimation of the community. Ballard v. Wagner, 2005 ME 86, ¶ 10, 877 A.2d 1083, 1087.  Classification of a former employee as having abandoned her job rather than as having resigned is the kind of statement that is capable of diminishing the reputation of the former employee in the estimation of the typical employer and, therefore, it is defamatory if false.

The questions that remain are whether there is sufficient evidence to find the job abandonment classification was false and whether the identified publications are actionable.  In her complaint, Shelly Flood alleges that "the Bank has published and forced Shelly Flood to publish false statements defaming her occupational and professional fitness, including statements that her employment was terminated for 'job abandonment' or for reasons relating to her lack of fitness for her position."  (Amended Complaint ¶ 21.)

This court has previously concluded that compelled self-publication can support a defamation claim under Maine law.  Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 222 (D. Me. 2002) (Singal, J.);  Carey v. Mt. Desert Island Hosp., 910 F. Supp. 7, 13 (D. Me. 1995) (Brody, J.).  However, there is no need to delve into that theory in this case.  Shelly Flood has not presented any actual evidence of self-publication.

In her statement of additional facts, Shelly establishes that the Bank told the Maine Human Rights Commission that she was classified as having abandoned her job.  (Additional

Statement ¶ 103.)  She also contends that by putting job abandonment in its own records, the Bank published the defamatory statement throughout the Bank's organization.  (Pl.'s Objection at 12.)  In her additional statement, she maintains that she learned of the classification "via computer."  (Additional Statement ¶ 100.)  In a prior order on the Floods' first motion to amend the complaint to add, among other things, Shelly's defamation claim, I granted leave to amend but limited Shelly to her self-publication theory, explaining that "other statements or theories of the claim cannot be asserted because the complaint fails to allege precisely what other statements were made and to whom and under what circumstances those additional statements were made." (Aug. 1, 2012, Order on Motion to Amend at 8, ECF No. 31.)  Although notified of her right to object to the ruling before the District Court Judge, Shelly did not pursue an objection.  Under the circumstances, Flood has failed to preserve her claims concerning internal bank publication and publication to the Maine Human Rights Commission.

Beyond this stumbling block, I am not persuaded that Shelly Flood has generated a genuine issue related to abuse of the conditional privilege that permits an employer to communicate employment information within its own organization and to a state agency investigating a charge of discrimination.  Defamation law recognizes a conditional privilege that protects against liability where the publication in question is made in the context of a communication that promotes an important interest in frank speech held by the publisher and the recipient.  Morgan, 2008 ME 26, ¶ 32, 941 A.2d at 455-56;  Rice v. Alley, 2002 ME 43, ¶ 22, 791 A.2d 932, 936.  Whether the privilege exists in a given context is a question of law; whether the privilege was abused is a question of fact.  Rice, 2002 ME 43, ¶ 21.

Making an internal record of the reason why an employee separates from employment clearly serves an important legal interest.  Similarly, the Bank had an important legal interest in

informing the Maine Human Rights Commission of the reason for Shelly's separation that it placed in its records.  The Commission also fulfills an important role in its receipt of such information.  "Any situation in which an important interest of the recipient will be furthered by frank communication may give rise to a conditional privilege." Lester v. Powers, 596 A.2d 65, 70 (Me. 1991).  The conditional privilege applies in this case as a matter of law.  Consequently, in order to preserve her defamation claim, Shelly must come forward with evidence sufficient to support a finding that the Bank abused the privilege. Morgan, 2008 ME 26, ¶ 34, 941 A.2d at 456.

Abuse is demonstrated by a communication made outside the normal channels;  or by a communication that the defendant knows is false, knows is probably false, or knows is subject to serious doubt;  or by a communication that is made out of spite or ill will. Id.  Comparing the facts of her case to those in Swift, Shelly argues that she has raised a genuine issue of fact whether the Bank abused the privilege because she says she has raised a genuine issue whether she was terminated out of discriminatory animus.  (Pl.'s Objection at 13.)  Although the Bank of America employee in Swift was also classified as having abandoned her job and presented a discrimination claim, the similarities stop there.  Unlike Shelly Flood, Ms. Swift sought to return to work following leave for a serious medical condition and sought an unpaid leave accommodation upon expiration of paid leave.  She also expressed a willingness to return to work without a medical authorization.  The Bank made no argument that those requests would have been unreasonable accommodations.  2009 U.S. Dist. Lexis 22499, at *41-42, 2009 WL 723521, at *13.  Instead, on one version of the facts, the Bank classified someone who could not presently return to work as a job abandoner despite what might be construed as a reasonable request for accommodation.  Here, Shelly had no right to pursue an accommodation of her

emotional upset over what she regarded (wrongly or rightly) as undeserved negative evaluations. Consequently, the Bank acted within its rights to expect her to show up for work and to pursue her claim of sexual orientation discrimination while maintaining active employment.  Under these circumstances, the job abandonment classification does not reflect abuse of the conditional privilege because the classification is one reasonable assessment of what transpired, "even though it may not be technically accurate."  McCullough v. Visiting Nurse Serv., 1997 ME 55, ¶ 10, 691 A.2d 1201, 1204.  Paraphrasing McCullough, to a reasonable person, a statement that Shelly abandoned her job is no more damaging to her reputation than a statement that she failed to report to work despite legitimately being required to do so.  See id.  Indeed, this may well make the statement not defamatory for being "substantially true," id., but in any event it precludes a finding that the Bank abused its privilege to record internally and to relate to the Maine Human Rights Commission its classification for Shelly's failure to report to work.

**B.     Keri Flood's Claims (counts V and VI)**

Keri Flood alleges that the Bank tortiously interfered with her employment with ABM by falsely accusing her of threatening and assaultive behavior against a bank employee.  (Amended Complaint ¶¶ 43-51.)  She also alleges defamation based on the same underlying representations. (Id. ¶ 55.)  The Bank challenges both claims.

### 1.     Defamation (count V)

The Bank says the record is devoid of evidence that any such statements were ever published to ABM.  According to it, Roper merely told Dietrich that Keri was no longer allowed on premises and provided no additional information.  (Motion at 22.)  If there is a genuine issue related to publication, then the Bank says its communication to ABM was privileged because ABM provides the Bank with services inside the Bank's premises.  (Id.)  The Bank contends that

Keri has failed to raise a genuine issue of abuse of the privilege.  (Id. at 23.)  Alternatively, the Bank argues that the record does not demonstrate negligence in connection with the communication.  (Id. at 23-24.)  In response, Keri notes that the defamatory communication was published not only to ABM, but also to the Bank's management company, CBRE, and to Keri's boss, Dietrich.  Keri also asserts that the communication was made not just by Roper, but also by Castle.  (Pl.'s Objection at 13.)

The statement in question, an accusation of attempted pushing or tripping on a staircase, is defamatory in nature and concerned Keri's fitness for employment, making proof of special damages unnecessary (Keri could establish damages, anyway, based on the loss of her job). Thus, the only elements that are contested are whether the facts can support a finding of an unprivileged publication to a third party and fault amounting at least to negligence on the part of the publisher.  Cole, 2000 ME 104, ¶ 5, 752 A.2d at 1193.

Reviewing the factual statements, there is a reasonable inference that the allegations against Keri were communicated to Dietrich and/or Kinsley.  Exactly who communicated them is not clear, but the Dietrich-Kinsley email exchange reflects that they came to learn the nature of the allegations against Keri.  The logical inference is that the information came from a source within the Bank.  This raises a genuine issue concerning publication.

The communication of grounds for excluding an ABM employee from the Bank's premises advances an important interest of ABM, which bears potential liability for its employee's acts.  Consequently, the conditional privilege applies in this kind of scenario.  On the issues of abuse of the privilege and fault amounting at least to negligence, genuine issues exist because Jackson's allegations were published by Castle, the Bank's agent, ostensibly in service to the Bank.  The Bank is chargeable with Castle's act and her knowledge.  Gavrilovic v.

Worldwide Languages Res., Inc., 441 F. Supp. 2d 163, 183 (D. Me. 2006) ("Under agency principles, [agent's] fault is imputed to his employer[.]"); Picher v. Roman Catholic Bishop of Portland, 2009 ME 67, ¶ 32, 974 A.2d 286, 296 ("An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.") (quoting Restatement (Third) of Agency § 7.07 (2006)); Legassie v. Bangor Publ. Co., 1999 ME 180, ¶ 5, 741 A.2d 442, 444 ("Generally, an employer may be vicariously liable for the negligence of its employees, but not for the negligence of independent contractors.") (citing Restatement (Second) of Torts §§ 409-429 (1965)); Nyer v. Carter, 367 A.2d 1375, 1378 (Me. 1977) ("[I]f a tort was committed by the agent, the principal is liable if the act was done within the course and scope of the agent's employment, even though appellant did not specifically authorize the tortious conduct."). If the jury should accept Keri's testimony that the incident is a complete fabrication, one possible inference is that Castle was behind the fabrication. On that version of the evidence, the publication was made with knowledge it was false, satisfying both the abuse element and the fault element.[20]

### 2.    Tortious interference (count VI)

The Bank argues that the record cannot support a tortious interference claim. It once more focuses on Roper's communication with Dietrich, maintaining that he only stated that Keri was not welcome on the premises any longer and asserting that "there are no other admissible facts that anyone else from the Bank ever spoke with ABM about Flood's position at the Belfast location." (Motion at 25.) As explained above, in footnote 15, the email exchange between Dietrich and Kinsley is part of the stipulated record. That evidence is capable of supporting a

---

[20]    There is a controversy about Roper's conduct and whether the facts pertaining to him are sufficient to support a finding of abuse of the privilege or fault. That is a more complicated analysis and it is unnecessary in light of Castle's connection to the claim.

reasonable inference that the Bank published the nature of the allegations to Dietrich and/or Kinsley.

Tortious interference can be shown with evidence of (1) an existing contract;  (2) interference with the contractual relationship through the defendant's use of fraud or intimidation;  (3) proximate damages.  <u>Currie v. Indus. Sec., Inc.</u>, 2007 ME 12, ¶ 30, 915 A.2d 400, 408.   The Bank has not disputed that the statement concerned a fact material to Keri's employment with ABM, was designed to induce another to act, or that it was in fact relied upon to Keri's detriment.  The only disputed element is the second.  To demonstrate the elements of fraud, the plaintiff must show (1) a false representation (2) of material fact, (3) made with knowledge of the falsity or with reckless disregard, (4) for the purpose of inducing another to act, where (5) the other person in fact justifiably relies on the representation to the plaintiff's harm.  <u>Sherbert v. Remmel</u>, 2006 ME 116, 908 A.2d 622, n.3.  For reasons already discussed, there is a genuine issue whether the Bank communicated a false statement with knowledge of its falsity.

## CONCLUSION

For reasons set forth above, I recommend that the court grant, in part, Defendants' Motion for Summary Judgment (ECF No. 60), by dismissing counts one and two, and deny the motion as to Keri Flood's claim.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which <em>de novo</em> review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

   Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

          /s/ Margaret J. Kravchuk
          U.S. Magistrate Judge

July 24, 2013